## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JUSTIN JETTER,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : **Case No.:**   22-1212 |
| | : |
| **OAKMONT CARE LLC d/b/a** | : |
| **OAKMONT CENTER FOR NURSING &** | : |
| **REHABILITATION and PRESTIGE** | : **COMPLAINT IN CIVIL ACTION** |
| **HEALTHCARE GROUP, LLC,** *jointly* | : |
| *and severally,* | : |
| | : |
| | : |
| **Defendants.** | : |
| | : |

Filed on Behalf of Plaintiff:
Justin Jetter

Counsel of Record for this Party:

**J.P. WARD & ASSOCIATES, LLC**

Joshua P. Ward
Pa. I.D. No. 320347

The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Telephone:   (412) 545-3015
Fax No.:   (412) 540-3399
E-mail:   jward@jpward.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JUSTIN JETTER,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : Case No.: |
| | : |
| **OAKMONT CARE LLC d/b/a** | : |
| **OAKMONT CENTER FOR NURSING &** | : |
| **REHABILITATION and PRESTIGE** | : |
| **HEALTHCARE GROUP, LLC,** *jointly* | : |
| *and severally,* | : |
| | : |
| **Defendants.** | : |

## **COMPLAINT**

AND NOW, comes Plaintiff, Justin Jetter, by and through the undersigned counsel, J.P. Ward & Associates, LLC. and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendants, Oakmont Care LLC d/b/a Oakmont Center for Nursing & Rehabilitation and Prestige Healthcare Group, LLC, jointly and severally, of which the following is a statement:

1. Justin Jetter (hereinafter "Mr. Jetter"), is an adult individual who currently resides at 4918 Kincaid Street, Pittsburgh, Pennsylvania 15224.

2. Defendant, Oakmont Care LLC d/b/a Oakmont Center for Nursing & Rehabilitation (hereinafter "Oakmont Center"), is a company located at 26 Ann Street, Oakmont, Pennsylvania 15139.

3. Defendant, Prestige Healthcare Group, LLC (hereinafter "Prestige") is a company doing business locally at 909 West Street, Pittsburgh, PA 15221.

4. Defendant, Prestige Healthcare Group, LLC (hereinafter "Prestige") is a company with a headquarters located at 20 Robert Pitt Drive, Suite 209, Monsey, NY 10952.

5. Defendants are financially intertwined as they share assets and debts.

6. Several Managers and the Human Resource Representative of Oakmont Center are also employed by Prestige.

## JURISDICTION AND VENUE

7. Jurisdiction is proper as Mr. Jetter brings this lawsuit under of the Civil Rights Act of 1866, 42 U.S.C. §1981 (hereinafter, "§1981").

8. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9. Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

## PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS

10. On or about February 12, 2018, Mr. Jetter initiated employment with Oakmont Center as a Certified Nursing Assistant ("CNA").

### A. **Oakmont Center Discriminated Against Mr. Jetter Based on Race and Fostered a Racially Hostile Work Environment.**

11. Mr. Jetter identifies as an African American male.

12. Throughout Mr. Jetter's employment he was subjected to discrimination based on race and a racially hostile work environment.

13. On or about January of 2020, Oakmont Center's Administrator held a meeting with several African American employees in which she stated, "You guys are going to have to stop keeping your hair the same way, so we know who's who. Heather, not you." Coworker, Heather (hereinafter, "Ms. Heather"), was the only Caucasian present. Mr. Jetter, and others present, took this to mean that 'all African Americans have similar facial features and are virtually indistinguishable.' Obviously, this was a historically well-known racial stereotype dating back to the political propaganda of the slavery and reconstruction eras. Said statement was obviously perceived as hurtful and demeaning to African Americans.

14. Thereafter, on or about late January of 2020, the labor union started a petition against the Administrator for her racially discriminatory conduct. Mr. Jetter signed the petition along with several of his coworkers.

15. As a result of the petition, the Administrator was terminated for her discriminatory misconduct.

16. Although the Administrator was terminated, Mr. Jetter continued to be forced to endure a racially hostile work environment and discrimination due to his race.

17. On one occasion, Mr. Jetter was assisting a resident in his room, with two aides present, when the resident requested to get something out of the bathroom. When Mr. Jetter bent down to unlock his wheelchair, the resident struck Mr. Jetter in the eye with a closed fist.

18. Mr. Jetter immediately reported the physical attack to his supervisor and called for a third-party evaluation of the resident's mental wellbeing to ensure the resident was not a harm to himself or others.

19. Thereafter, Mr. Jetter was informed the patient was deemed to have been "in his right mind", therefore it was Oakmont Center's responsibility to investigate the incident.

20. Although Oakmont Center collected statements from all present parties stating the resident was the attacker, Mr. Jetter was suspended from the workplace for approximately one month.

21. Upon information and belief, Mr. Jetter was suspended in retaliation for signing the petition and making complaints, internally and to the labor union, related to the racially discriminatory conduct of the prior Administrator.

22. Once he was permitted to return to the workplace, Mr. Jetter began to be viewed with a higher level of scrutiny than his Caucasian counterparts by new Administrator, "Michelle" (hereinafter, "Ms. Michelle").

23. On one occasion, Mr. Jetter was called a "coon" by a resident with five other aides present. In an effort to remain professional and ensure the situation did not escalate, Mr. Jetter immediately left the room.

24. Thereafter, the resident formally reported Mr. Jetter to Oakmont Center and alleged she "feared for her life."

25. In order to be in compliance with state protocols for alleged verbal abuse, Oakmont Center was to report the incident to the State for further investigation, to which would include receiving a formal statement from Mr. Jetter.

26. Upon information and belief, Oakmont Center failed to report the incident, as Mr. Jetter was never contacted by the State regarding the incident.

27. Further, all five aides present for the incident wrote statements that explicitly stated the resident's use of a derogatory term towards Mr. Jetter and reported that Mr. Jetter immediately departed from the room.

28. Although all evidence revealed a lack of misconduct, Ms. Michelle informed Mr. Jetter, "You're a pretty big guy and we don't know what you're capable of."

29. Thereafter, Mr. Jetter was put on "last chance" by the Director of Nursing for his alleged late arrivals to his shifts and inappropriate conduct.

30. Upon information and belief, Mr. Jetter was placed on "last chance" in retaliation for his involvement in the union petition which resulted in the termination of a supervisor. Indeed, Mr. Jetter was involved, through no fault of his own, in several incidents involving racial comments and violence towards him. At all times, Mr. Jetter's reports regarding these incidents were for the betterment of the company. However, Oakmont Center apparently viewed Mr. Jetter as a problem or liability and sought to remove him from the workplace.

31. Although all of Oakmont Center's investigations into Mr. Jetter's alleged workplace misconduct came back as 'unfounded', Mr. Jetter was informed of Oakmont Center's plan to terminate his employment.

32. Significantly, Caucasian coworker, "Heather" (hereinafter "Ms. Heather") was also placed on "last chance" by the Director of Nursing for her chronic late arrivals and absenteeism.

33. Upon information and belief, although the investigation into Ms. Heather was 'founded', she was permitted to remain employed with Oakmont Center.

34. Following notification of his impending termination, Mr. Jetter reached out to his union representative regarding the false accusations, to which he was informed he would have a "target on his back" if he attempted to continue his employment with Oakmont Center.

35. Thereafter, on or about September 9, 2020, Mr. Jetter was forced to resign from his employment with Oakmont Center.

36. The parties entered into a written settlement agreement and release. The terms can be summarized as follows: 1) non-monetary mutual release; 2) no contest of unemployment benefits; 3) neutral reference for future job applications; 4) confidentiality. Mr. Jetter was represented by the labor union. The agreement and release was signed by both parties. (A true and correct copy of the Settlement Agreement and Release is attached hereto and incorporated fully as Exhibit "A").

B. **Oakmont Center Subsequently Defamed Mr. Jetter and Tortiously Interfered with his Employment Contract with the VA Hospital.**

37. Thereafter, Oakmont Center breached the agreement and contested Mr. Jetter's application for unemployment benefits.

38. On or about April 11, 2021, Mr. Jetter secured employment with the Department of Veterans Affairs as a Nursing Assistant. Mr. Jetter began working at the VA and performing his duties. As part of standard operating procedures at the VA, a background check was conducted over a period of six (6) months.

39. On or about September 2, 2021, Mr. Jetter received a letter from the Department of Veterans Affairs regarding the completion of his background check. The letter stated he was no longer suitable for employment due to prior "misconduct or negligence in employment" and "criminal or dishonest conduct." (A true and correct copy of the letter is attached hereto, made a part hereof, and marked as Exhibit "B".)

40. The letter further stated an investigation revealed he had been terminated from Oakmont Center for "Verbal Abuse and Resident Intimidation." *See* Exhibit "B".

41. On or about September 8, 2021, Oakmont Center Executive Director, Matthew Tack (hereinafter, "Mr. Tack") informed the Department of Veterans Affairs *via* email of the false

statement and acknowledged that Oakmont Center was contractually obligated to provide a neutral job reference. (A true and correct copy of the email is attached hereto, made a part hereof, and marked as Exhibit "C".)

42. Regardless, on or about September 8, 2021, Mr. Jetter was terminated from his employment with the Department of Veterans Affairs as a result of Oakmont's breach of contract and false allegations of "Verbal Abuse and Resident Intimidation."

43. Lastly, on or about October 21, 2021, Oakmont Center retaliated against and breached Mr. Jetter's contract yet again.  Mr. Jetter was informed *via* email from a potential employer that Oakmont Center failed to verify his employment. (A true and correct copy of the email is attached hereto, made a part hereof, and marked as Exhibit "D".)

44. Managers and the Human Resource Representative of Oakmont are also employed with Prestige and the Defendants are financial intertwined as they share assets and debts.

## COUNT I
## RACIAL DISCRIMINATION IN
## VIOLATION OF SECTION 1981
*(Plaintiff v. Defendants, Jointly and Severally)*

45. Mr. Jetter incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

46. 42 U.S.C. § 1981(a) provides that:

> "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws …as is enjoyed by white citizens."

*Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) (holding that Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race."); see also, *Comcast Corp. v. Natl. Assn. of African Am.-Owned Media*, 140 S. Ct. 1009, 1010 (2020).

47. Thus, Section 1981 prohibits employers from engaging in intentional racial discrimination.

48. Mr. Jetter faced discriminatory treatment in the form of heightened scrutiny and racially discriminatory comments and behaviors by his superiors throughout his employment.

49. The comments became so severe that on or about late January of 2020, Mr. Jetter signed a union petition against the former Administrator for her racially discriminatory conduct.

50. Although Defendants terminated the Administrator, Mr. Jetter continued to be discriminated against and viewed with a higher level of scrutiny due to his race.

51. Defendants employed a disparate approach to disciplining Caucasian and African American employees, further illustrating the discriminatory animus and culture present at Defendants.

52. Mr. Jetter began to be reprimanded for his alleged involvement in workplace misconduct, while Caucasian counterpart, Ms. Heather, was permitted to disregard company policies and maintain employment.

53. Although all evidence and investigations revealed his innocence, Defendants suspended and ultimately arranged to terminate Mr. Jetter.

54. Despite having entered into a settlement agreement and release, Defendants made defamatory comments and intentionally interfered with Mr. Jetter's contractual relationship with the VA Hospital, resulting in his termination.

55. Incredibly, on October 21, 2021, Defendants again breached its contract and retaliated against Mr. Jetter by refusing to honor its obligation to provide a neutral reference.

56. All of the aforementioned conduct was part of a broad an ongoing pattern of racially motivated retaliation, harassment and abuse of Mr. Jetter.

57. Therefore, Defendants permitted, condoned, and perpetuated the racial discrimination of Mr. Jetter in the workplace and therefore deprived him of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

58. Defendants' actions against Mr. Jetter were done intentionally, recklessly or with conscious indifference to Mr. Jetter's rights.

59. As a direct and proximate result of Defendants' racial discrimination against Mr. Jetter, Mr. Jetter has suffered and continues to suffer damages, including but not limited to lost wages and benefits, anxiety, loss of reputation, lost career opportunities, emotional distress, humiliation and inconvenience.

WHEREFORE, Plaintiff, Mr. Jetter, hereby requests this Honorable Court consider the above and grant relief in his favor, including back pay, front pay, compensatory and punitive damages, costs and attorney fees.

## COUNT II
## HOSTILE WORK ENVIRONMENT
## VIOLATION OF SECTION 1981
*(Plaintiff v. Defendants, Jointly and Severally)*

60. Mr. Jetter incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

61. To establish a § 1981 claim alleging a hostile work environment based on race, a plaintiff must show that: "(1) the employee suffered intentional discrimination because of his/her race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability, meaning the employer is responsible." *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017)

62. Mr. Jetter faced discriminatory treatment in the form of racially insensitive comments and was viewed with a higher level of scrutiny than his Caucasian counterparts throughout his employment.

63. The discrimination was severe and pervasive, increasing in intensity almost daily.

64. Further, the discrimination detrimentally affected Mr. Jetter and his African American counterparts, as they were forced to reach out to the union to implement a petition regarding their mistreatment in the workplace.

65. Defendants employed a disparate approach to disciplining Caucasian and African American employees, further illustrating the discriminatory animus and culture present at Defendants' facility.

66. Following the petition, Defendants began to falsely accuse Mr. Jetter of workplace misconduct to which all evidence and investigations revealed his innocence.

67. Defendants were aware of the continued discrimination and racially hostile work environment yet continued to force and subject Mr. Jetter to baseless accusations and investigations into his workplace conduct.

68. Thereafter, Mr. Jetter was forced to resign from his employment with Defendants following his notification of their plan to terminate his employment and his union representative's advice that he would have a "target on his back" if he attempted to continue his employment with Defendants.

69. Despite having entered into a settlement agreement and release, Defendants made defamatory comments and intentionally interfered with Mr. Jetter's contractual relationship with the VA Hospital, resulting in his termination.

70. Incredibly, on October 21, 2021, Defendants again breached its contract and retaliated against Mr. Jetter by refusing to honor its obligation to provide a neutral reference.

71. All of the aforementioned conduct was part of a broad an ongoing pattern of racially motivated retaliation, harassment and abuse of Mr. Jetter.

72. Therefore, Defendants permitted, condoned, and perpetuated the racial discrimination of Mr. Jetter in the workplace and therefore deprived him of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

73. Therefore, Defendants permitted, condoned, and perpetuated the racially hostile work environment to which Mr. Jetter was forced to endure, and therefore deprived him of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

74. Defendants' actions against Mr. Jetter were done intentionally, recklessly or with conscious indifference to Mr. Jetter's rights.

75. As a direct and proximate result of Defendants' racial discrimination against Mr. Jetter, Mr. Jetter has suffered and continues to suffer damages, including but not limited to lost wages and benefits, anxiety, loss of reputation, lost career opportunities, emotional distress, humiliation and inconvenience.

WHEREFORE, Plaintiff, Mr. Jetter, hereby requests this Honorable Court consider the above and grant relief in his favor, including back pay, front pay, compensatory and punitive damages, costs and attorney fees.

## COUNT III
## RETALIATION
## VIOLATION OF SECTION 1981
*(Plaintiff v. Defendants, Jointly and Severally)*

76. Mr. Jetter incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

77. To establish a retaliation, claim in violation of § 1981, a plaintiff must establish the following prima facie case: "(1) he engaged in protected activity; (2) employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action." *Castleberry v. STI Group*, 863 F.3d 259, 267 (3d Cir. 2017).

78. In a retaliation case under § 1981, a plaintiff must demonstrate that there had been an underlying § 1981 violation; in doing so, plaintiff must have acted under a good faith, reasonable belief that a violation of § 1981 existed. *Castleberry v. STI Group*, 863 F.3d 259, 267 (3d Cir. 2017).

79. Mr. Jetter engaged in a protected activity by signing the union petition pertaining to the racially hostile work environment.

80. Following the union petition, Defendants began to closely monitor and scrutinize Mr. Jetter for his attendance and workplace conduct. This mistreatment was in stark contrast to that of Mr. Jetter's Caucasian coworkers, such as Ms. Heather, who were arriving late and chronically absent.

81. In one instance, Mr. Jetter was wrongfully accused of "verbal intimidation" of a resident, which was supported by statements from all five aides present for the incident.

82. Rather than be in compliance with state protocols for alleged verbal abuse, upon information and belief, Defendants failed to report the incident to the State for further investigation.

83. Upon information and belief, Defendants refused to report the incident in retaliation for Mr. Jetter's participation in the union petition.

84. Thereafter, Defendants placed Mr. Jetter on a month-long suspension for another alleged instance "verbal abuse", although all five aides present for the incident wrote statements that explicitly stated his innocence.

85. While all evidence revealed a lack of misconduct, Ms. Michelle informed Mr. Jetter, "You're a pretty big guy and we don't know what you're capable of" and placed him on "last chance."

86. Although all investigations into Mr. Jetter's workplace conduct came back unfounded, he was informed of Defendants' scheme to terminate his employment.

87. Following notification of his impending termination, Mr. Jetter reached out to his union representative regarding the false accusations. Mr. Jetter was informed he would have a "target on his back" if he attempted to continue his employment with Defendants, alluding to Defendants' plan to retaliate against Mr. Jetter if he contested his termination.

88. Thereafter, on or about September 9, 2020, Mr. Jetter was forced to resign from his employment with Defendants.

89. The adverse employment action of his forced resignation has both temporal and proximal relations to Mr. Jetter's engagement in a protected activity.

90. Therefore, Defendants retaliated against Mr. Jetter for his attempt to address the racially hostile workplace and disparate treatment by continuing to wrongfully discipline and

subject Mr. Jetter to the racially discriminatory environment known to be created and enforced by the above individuals.

91. Despite having entered into a settlement agreement and release, Defendants made defamatory comments and intentionally interfered with Mr. Jetter's contractual relationship with the VA Hospital, resulting in his termination.

92. Incredibly, on October 21, 2021, Defendants again breached its contract and retaliated against Mr. Jetter by refusing to honor its obligation to provide a neutral reference.

93. All of the aforementioned conduct was part of a broad an ongoing pattern of racially motivated retaliation, harassment and abuse of Mr. Jetter.

94. Therefore, Defendants permitted, condoned, and perpetuated the racial discrimination of Mr. Jetter in the workplace and therefore deprived him of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

95. Therefore, Defendants permitted, condoned, and perpetuated the racially hostile work environment to which Mr. Jetter was forced to endure, and therefore deprived him of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

96. Defendants' actions against Mr. Jetter were done intentionally, recklessly or with conscious indifference to Mr. Jetter's rights.

97. As a direct and proximate result of Defendants' racial discrimination against Mr. Jetter, Mr. Jetter has suffered and continues to suffer damages, including but not limited to lost wages and benefits, anxiety, loss of reputation, lost career opportunities, emotional distress, humiliation and inconvenience.

WHEREFORE, Plaintiff, Mr. Jetter, hereby requests this Honorable Court consider the above and grant relief in his favor, including back pay, front pay, compensatory and punitive damages, costs and attorney fees.

## COUNT IV
## COMMON LAW
## TORTIOUS INTERFERENCE WITH CONTRACT
*(Plaintiff v. Defendants, Jointly and Severally)*

98. Mr. Jetter incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

99. Tortious Interference with Existing and Prospective Contracts For tortious interference with contract claims, Pennsylvania has specifically adopted the 7 Restatement (Second) of Torts § 766, which provides that "[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." See *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978).

100. Courts interpreting this standard have set forth the following elements that a plaintiff must prove in order to prevail on a cause of action for tortious interference with an existing or prospective contractual relation -- "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct." *Crivelli v. General*

*Motors Corp.*, 215 F.3d 386, 344 (3d Cir. 2000); see also, *Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997).

101. On or about April 11, 2021, Mr. Jetter secured employment with the Department of Veterans Affairs as a Nursing Assistant. Mr. Jetter began working at the VA and performing his duties. As part of standard operating procedures at the VA, a background check was conducted over a period of six (6) months.

102. On or about September 2, 2021, Mr. Jetter received a letter from the Department of Veterans Affairs regarding the completion of his background check. The letter stated he was no longer suitable for employment due to prior "misconduct or negligence in employment" and "criminal or dishonest conduct." *See* Exhibit "B".

103. The letter further stated an investigation revealed he had been terminated from Defendants for "Verbal Abuse and Resident Intimidation." *See* Exhibit "B".

104. On or about September 8, 2021, Mr. Tack informed the Department of Veterans Affairs *via* email of the false statement and acknowledged that Defendants were contractually obligated to provide a neutral job reference. *See* Exhibit "C".

105. Regardless, on or about September 8, 2021, Mr. Jetter was terminated from his employment with the Department of Veterans Affairs as a result of Defendants' breach of contract and false allegations of "Verbal Abuse and Resident Intimidation."

106. Lastly, on or about October 21, 2021, Defendants retaliated against and breached Mr. Jetter's contract yet again. Mr. Jetter was informed *via* email from a potential employer that Defendants failed to verify his employment. *See* Exhibit "D".

107. As a direct and proximate result of Defendants' racial discrimination against Mr. Jetter, Mr. Jetter has suffered and continues to suffer damages, including but not limited to lost

wages and benefits, anxiety, loss of reputation, lost career opportunities, emotional distress, humiliation and inconvenience.

WHEREFORE, Plaintiff, Mr. Jetter, hereby requests this Honorable Court consider the above and grant relief in his favor, including back pay, front pay, compensatory and punitive damages, and costs of suit.

## COUNT V
## COMMON LAW
## BREACH OF SETTLEMENT AND RELEASE
*(Plaintiff v. Defendants, Jointly and Severally)*

108. Mr. Jetter incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

109. The parties entered into a written settlement agreement and release. The terms can be summarized as follows: 1) non-monetary mutual release; 2) no contest of unemployment benefits; 3) neutral reference for future job applications; 4) confidentiality. Mr. Jetter was represented by the labor union. The agreement and release was signed by both parties. *See* Exhibit "A".

110. The parties were bound by the duty of good faith and fair dealing.

111. All conditions precedent to recovery have occurred.

112. Defendants materially breached the agreement and contested Mr. Jetter's application for unemployment benefits.

113. On or about April 11, 2021, Mr. Jetter secured employment with the Department of Veterans Affairs as a Nursing Assistant. Mr. Jetter began working at the VA and performing his

duties. As part of standard operating procedures at the VA, a background check was conducted over a period of six (6) months.

114. On or about September 2, 2021, Mr. Jetter received a letter from the Department of Veterans Affairs regarding the completion of his background check. The letter stated he was no longer suitable for employment due to prior "misconduct or negligence in employment" and "criminal or dishonest conduct." *See* Exhibit "B".

115. The letter further stated an investigation revealed he had been terminated from Defendants' facility for "Verbal Abuse and Resident Intimidation." *See* Exhibit "B".

116. On or about September 8, 2021, Mr. Tack informed the Department of Veterans Affairs *via* email of the false statement and acknowledged that Defendants were contractually obligated to provide a neutral job reference. *See* Exhibit "C".

117. Regardless, on or about September 8, 2021, Mr. Jetter was terminated from his employment with the Department of Veterans Affairs as a result of Defendants' breach of contract and false allegations of "Verbal Abuse and Resident Intimidation."

118. Lastly, on or about October 21, 2021, Defendants retaliated against and breached Mr. Jetter's contract yet again. Mr. Jetter was informed *via* email from a potential employer that Defendants failed to verify his employment. *See* Exhibit "D".

119. All of the aforementioned breaches were material and deprived Mr. Jetter of the benefit of his bargain.

120. As a direct and proximate result of this breach of contract, Mr. Jetter has suffered and will continue to suffer damages as the result of Defendants' breach, including, lost wages, unreimbursed expenses, unemployment compensation benefits, and consequential damages related to lost income.

WHEREFORE, Plaintiff, Mr. Jetter, hereby requests this Honorable Court consider the above and grant relief in his favor, including back pay, front pay, compensatory damages, and costs of suit.

**JURY TRIAL DEMANDED.**

                                                Respectfully submitted,

                                                **J.P. WARD & ASSOCIATES, LLC.**

Date: August 22, 2022                      By: */s/ Joshua P. Ward*
                                                      Joshua P. Ward (Pa. I.D. No. 320347)

                                                        J.P. Ward & Associates, LLC.
                                                        The Rubicon Building
                                                        201 South Highland Avenue
                                                        Suite 201
                                                        Pittsburgh, PA 15206

                                                        Counsel for Plaintiff